FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 27, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

KARI A.

                    Plaintiff,

          v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

                    Defendant.

No.    2:17-CV-00322-SAB

ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

Before the Court are the parties' motions for summary judgment, ECF Nos. 14 and 15. The motions were heard without oral argument. For the reasons set forth below, the Court **GRANTS** plaintiff's motion, **DENIES** defendants' motion, and remands for an award of benefits.

This case presents two main questions. First is whether or not the ALJ improperly discredited Plaintiff's symptom testimony. The second issue is whether the ALJ erred by discrediting the expert testimony of Plaintiff's treating physicians. This case originally went before a magistrate judge in 2013, and the Parties submitted a stipulated motion for remand. On remand, the ALJ once again discredited Plaintiff's testimony and the medical opinions of her treating physicians, without altering those sections of the order. The reasons provided for discrediting the testimony were error, and this court remands for an award of benefits under the credit-as-true doctrine.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ～ 1

## ADMINISTRATIVE PROCEEDINGS

On June 24, 2011, Plaintiff filed an application for social security insurance benefits. She alleged an onset date of May 1, 2007. Her application was denied initially and on reconsideration. On April 15, 2013, she testified at a hearing appealing that denial before an ALJ.

The ALJ discredited the testimony of Plaintiff's treating physicians, primarily because they did not treat Plaintiff during the benefits period, but also because they were inconsistent with other evidence in the record. Further, The ALJ discredited Plaintiff's self-reported symptom testimony, in part because it was inconsistent with that same evidence. The ALJ denied benefits, finding Plaintiff not disabled, on May 3, 2013.

Plaintiff appealed her denial to the Social Security Commission, which upheld the denial on November 7, 2014. Plaintiff appealed that denial for judicial review and moved for summary judgment. Rather than file a cross-motion, the Acting Commissioner at that time submitted a stipulated motion for remand for a new hearing and reconsideration. *See King v. Colvin*, 2:15-cv-0001-VEB, ECF No. 19 (Sept. 23, 2015.)

The ALJ again denied benefits after a new hearing, with almost identical rationales for discrediting Plaintiff's symptom testimony and the medical opinions of her treating physicians in the new order dated August 25, 2016. The vast majority of the 2016 order is identical to the 2013 order, including a number of typographical errors, suggesting that most of the 2016 order was pasted from the 2013 denial.[1] Plaintiff appealed this new denial to the Commission, was denied, and timely appealed to this Court under 42 U.S.C. § 405(g).

## SEQUENTIAL EVALUATION PROCESS

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant

---

[1] Most notably, the assertion that "Dr. Cox was her medical treatment provider, not her medical treatment provider," is contained in identical paragraphs in both orders.

shall be determined to be under a disability only if the claimant's impairments are of such severity that the claimant is not only unable to do his previous work, but cannot, considering claimant's age, education, and work experience, engage in any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant meets the definition of disabled under the Social Security Act. 20 C.F.R. § 404.1520(a)(4); *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

At step one, the ALJ must determine whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(b). Substantial gainful activity is defined as significant physical or mental activities done or usually done for profit. 20 C.F.R. § 404.1572. If the individual is engaged in substantial gainful activity, he or she is not disabled. 20 C.F.R. § 404.1571. If not, the ALJ proceeds to step two.

At step two, the ALJ must determine whether the claimant has a severe medically determinable impairment, or combination of impairments, that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If the claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled. If the ALJ finds the claimant does have a severe impairment or combination of impairments, the ALJ proceeds to step three.

At step three, the ALJ must determine whether any of the claimant's severe impairments "meets or equals" one of the listed impairments acknowledged by the Commissioner to be sufficiently severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; 20 C.F.R. § 404 Subpt. P. App. 1 ("the Listings"). If the impairment meets or equals one of the listed impairments, the claimant is *per se* disabled and qualifies for benefits. If not, the ALJ proceeds to the fourth step.

Before considering step four, the ALJ must determine the claimant's "residual functional capacity." 20 C.F.R. § 404.1520(e). An individual's residual functional capacity is his or her ability to do physical and mental work activities on a sustained basis despite

limitations from his impairments. 20 C.F.R. § 1545(a)(1). In making this finding, the ALJ must consider all of the relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3).

At step four, the ALJ must determine whether the claimant's residual functioning capacity enables the claimant to perform past relevant work. 20 C.F.R. § 404.1520(e)-(f). If the claimant can still perform past relevant work, he or she is not disabled. If the ALJ finds the claimant cannot perform past relevant work, the analysis proceeds to the fifth step.

At step five, the burden shifts to the Commissioner to prove the claimant is able to perform other work in the national economy, taking into account claimant's age, education, work experience, and residual functioning capacity. 20 C.F.R. § 404.1520(g). To meet this burden, the Commissioner must establish (1) the claimant is capable of performing other work; and (2) such work exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2); *Beltran v. Astrue*, 676 F.3d 1203, 1206 (9th Cir. 2012).

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner is governed by 42 U.S.C. § 405(g). The scope of review under Section 405(g) is limited, and the Commissioner's decision will be disturbed "only if the ALJ's decision was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard." *Shaibi v. Berryhill*, 870 F.3d 874, 878 (9th Cir. 2017). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C § 405(g). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012). However, when determining whether substantial evidence exists, a reviewing court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

A district court "may not reverse and ALJ's decision on account of an error that is harmless." *Id*. An error is harmless "where it is inconsequential to the [ALJ's] ultimate

nondisability determination." *Id.* at 1115. The burden of showing an error is harmful generally falls upon the party appealing the ALJ's decision. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

## STATEMENT OF FACTS

At the time of the hearing in 2013, Plaintiff was 27 years old. When she was 17, in 2003, she was involved in a serious traffic accident. A mattress fell off a truck traveling in front of her on a two-lane highway. A car drove over the mattress and careened into a ditch to the left of the passing lane. Another driver parked his car in what he thought was the shoulder to assist the driver in the ditch. A truck traveling in the passing lane swerved in front of Plaintiff to avoid the good Samaritan's parked car, and Plaintiff's car was subducted under the truck. The front of her car and her skull were crushed, and she fell into a week-long-coma. When she awoke, she was blind in one eye and suffered from aphasia, spinal pain, anxiety and depression, and cognitive impairments.

She was discharged from inpatient care in late 2003. At that time, her functional capacity was evaluated as severely limited, so much so that Plaintiff was directed not to take short trips on public transportation without assistance. In early 2004, after a few weeks of outpatient care, she received a mental health exam from St. Luke's Rehabilitation Institute, which did not indicate any substantial cognitive impairments. ECF No. 9, Ex. 12F, at 1030-36. She returned to school, but not to her part-time job at McDonald's, due to anxiety attacks stemming from the accident and the affect that it had on her reasoning

Plaintiff began working a series of jobs from 2005 to 2007. Her termination from her job in 2007 due to absences stemming from an illness marks the start of her alleged onset date. Plaintiff alleges that the termination, and the difficulties she had holding a job from 2005 to 2007, were due to residual physical and cognitive limitations stemming from the 2003 accident.

Later in 2007 she moved to Germany with her partner, where she remained until after her date last insured in 2009. Plaintiff was treated at Landstuhl Army Medical Center during that period of time. Most of the Landstuhl treatment notes are found in ECF No. 8. They

are difficult to read due to the poor scan quality, but include, most relevantly, two cognitive functioning tests.

In May of 2010, Plaintiff underwent a "formal assessment of complex communication and reasoning." ECF No. 8-8, Ex. 5F at 156. She completed a Functional Assessment of Verbal Reasoning and Executive Struggles (FAVRES) and a Test of Everyday Attention (TEA.) She demonstrated "grossly intact functional reasoning and judgment," however, she "did demonstrate delays in processing, difficulty with thought formulation, and a lack of higher level divergent thinking/reasoning." *Id.* at 157. The treating speech pathologist, Amanda Dyrek, concluded that the FAVRES results were "consistent with [Plaintiff's] diagnosed injury and . . . complaints." *Id*.

The TEA results likewise indicated that Plaintiff "may have difficulty with sustained attention during tasks of lengthy duration and possibly some effort required with auditory selective attention," and the results were "consistent with [Plaintiff's] medical history of head injury." *Id.*, at 158. Plaintiff demonstrated sustained improvement over the next few months. She took a contextual memory test on September 21, 2010. ECF No. 8-8, Ex. 5F at 15. That test appears to indicate normal immediate and delayed recall. *Id.* However, the test performed is not diagnostic, and there is no clear summary of the results.

When Plaintiff returned to the United States she began treatment with new doctors, Dr. Peter Endyke and Dr. Lylanya Cox. Those treatment notes indicate a recommendation that Plaintiff apply for social security benefits, and are consistent with Plaintiff's self-report of cognitive limitations, as well as chronic pain and depression and anxiety.

## THE ALJ'S FINDINGS

**At step one**, the ALJ found Plaintiff was not engaged in substantial gainful activity during the benefits period of May 1, 2007 through her date last insured of June 30, 2009. Administrative Record (AR) 32.

**At step two**, the ALJ found Plaintiff had the following severe impairments: left eye blindness. AR 32.

**At step three**, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404 Subpt. P. App. 1 (citing 20 C.F.R. §§ 416.920(d), 416.925 and 416.926). AR 32.

Before reaching step four, the ALJ found Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels as defined in 20 C.F.R. § 416.967(b), subject to the following limitations: an inability to do work requiring bilateral visual acuity, and an inability to do fine detailed works. AR. 27.

**At step four** the ALJ found Plaintiff able to perform past relevant work as an assistant manager during the benefits period (citing 20 C.F.R. § 404.1565). AR 39. As a result, the ALJ did not reach step five, and found that Plaintiff was not disabled during the benefits period.

## ISSUES FOR REVIEW

1. Whether the ALJ improperly rejected Plaintiff's symptom claims;
2. Whether the ALJ improperly discredited medical opinion evidence?

## DISCUSSION

### I.  Whether the ALJ Erred by Discrediting Plaintiff's Testimony?

Plaintiff claims The ALJ improperly discounted her testimony concerning the severity of her impairments. At the hearing, Plaintiff made the following statements concerning the severity of her alleged physical and mental symptoms:

- She suffers and suffered from short- and long-term memory loss, difficulty concentrating, and mental fatigue. AR 56-62.
- She has frequent, chronic migraines, roughly three times a week, which abate after 30 seconds with medication. AR 64.
- She suffers from depression and anxiety. AR 64-65.
- She suffers from back pain. AR 67.
- She experiences difficulty walking. AR 70.

*//*

### a. The ALJ's Credibility Determination

An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).

In this analysis, the claimant is not required to show "that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of that symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Nor must a claimant produce "objective medical evidence of the pain or fatigue itself, or the severity thereof." *Id*.

If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons to do so." *Smolen*, 80 F.3d at 1281. The ALJ determined Plaintiff satisfied the first step in this inquiry. AR 34. However, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms not entirely credible for the following reasons.

First, the ALJ found that a "gap" in medical treatment records from 2004 to 2010 suggested that the impairments complained of did not exist from 2004 to 2010. ECF No. 9.2, at 17. The ALJ narrowed the inquiry into medical treatment records from the benefits period. *Id*. ("There are very few treatment records for 2007 to 2009.")

Second, the ALJ noted inconsistencies between what medical treatment records there were and the alleged impairments. Notably, shortly after the 2003 automobile accident, Plaintiff underwent cognitive rehabilitation, and the testing associated with the culmination of that treatment indicated no significant cognitive or other mental health impairment.

Finally, the ALJ noted inconsistencies between the Plaintiff's stated impairments and her daily activities, as testified to by Plaintiff and described in a third-party function report

completed by Plaintiff's mother.

   *i.   The Use of a Treatment "Gap" to Discredit Plaintiff's Testimony*

The first reason the ALJ gave for rejecting Plaintiff's symptom testimony is not supported by the record as a whole. It is true that an ALJ may justify the rejection of a claimant's testimony regarding physical ailments due to a limited course of treatment for those conditions. *See, e.g., Burch v. Barnhart,* 400 F.3d 676, 681, (9th Cir. 2005); *Meanal v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). This is because the ALJ can reasonably infer that someone suffering from disabling pain or physical ailments would very likely seek medical treatment, and thus the failure to pursue treatment gives rise to questions about the existence or severity of the ailments. *Id.*

Here, the record demonstrates that Plaintiff underwent extensive treatment to address precisely the complained-of conditions. She was hospitalized for two weeks, then underwent treatment at an in-patient rehabilitation center for three weeks, before being discharged with further outpatient treatment. AR 1297. Her self-reported symptoms of back pain, depression, anxiety, reduced cognitive functioning, difficulty walking, and decreased stamina are all confirmed by the treatment records from that period. Reaching her maximum medical recovery should not preclude a claimant's subsequent recovery, provided that she was disabled for the benefits period notwithstanding the improvement.

   *ii.   Inconsistencies Between Symptom Testimony and Medical Evidence.*

The second reason, inconsistencies between Plaintiff's symptom claims and the objective medical evidence, constitutes a "specific, clear and convincing reason" for discounting the symptom claims. *See Smolen*, 80 F.3d at 1281. An ALJ must consider objective medical evidence when determining the intensity and persistence of a claimant's alleged symptoms. *See* 20 C.F.R. § 416.929(c)(2). However, an ALJ will not reject a claimant's statements "solely because the available medical evidence does not substantiate [a claimant's] statements." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ can consider in his credibility analysis").

Ninth Circuit case law, on the other hand, makes clear that "an ALJ may reject a claimant's statement about the severity of his symptoms and how they affect him if those statements are *inconsistent* with or *contradicted* by the objective medical evidence." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 887 (9th Cir. 2006) (emphasis added); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995).

One of The ALJ's alleged "inconsistencies" is simply not true. The ALJ asserts that "mental fatigue" is not established in the record. To the contrary, the very medical evidence that The ALJ cites establishes mental fatigue. ECF No. 9, Ex. 12F at 5.

The second alleged inconsistency is between Plaintiff's testimony regarding her post-accident mnemonic symptoms and the record. Plaintiff stated that during the benefits period, in 2007, she suffered from short-and long-term memory loss, severe enough that she could not remember what she ate for dinner the day before or whether or not she had changed her child's diaper. AR at 57-58.  However, her neuropsychological evaluation completed in early 2004 indicates that her only significant impairments at that time were cognitive fatigue and anxiety related decompensation. ECF No. 9, Ex. 12F at 5.  In the summary of that testing, the treating doctor reported that Plaintiff "reported no significant changes in memory functioning." ECF No. 9, Ex. 12F at 11. The ALJ found these tests were inconsistent with Plaintiff's testimony and discredited it. ECF No. 9.2.

 The Ninth Circuit has repeatedly emphasized that "while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison*, 759 F.3d at 1017, citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, at 1017. Reports of improvement in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms. *Id.*

//

The Ninth Circuit identified two chief sources of error when interpreting mental health testing, and set forth two corresponding interpretative aids. First, the Ninth Circuit recognized that symptoms wax and wane, and thus mental health testing must be interpreted in light of the entire record. *Garrison*, 759 F.3d at 1017. Second, the Ninth Circuit recognized that "doing well" in a clinical setting does not necessarily reflect an ability to enjoy success in a workplace, and thus significant weight is given to the absence of a medical expert's testimony regarding the patient's capacity to work. *Id*, at 1018-19.

In this case, the lion's share of testing indicates that Plaintiff's cognitive functioning was prone to waxing and waning, and there are multiple doctor's notes indicating that she was unable to work. In the weeks prior to the St. Luke's 2004 WAIS exam, she was in in-patient treatment. When discharged, she was found unable to work or return to school, ECF No. 8-9, Ex. 8F at 23, and was required to have "24 hour supervision by an adult," *id.*, at 31. In May of 2010, Plaintiff completed the FAVRES, with testing consistent with her self-reported cognitive and mnemonic limitations. ECF No. 8-8, Ex. 5F at 156-59. Upon Plaintiff's return to the United States, her treating doctors Dr. Endyke and Dr. Cox both found marked to severe cognitive limitations. *See Infra*, § II(a),(c).

Even the two pieces of evidence cited by the ALJ demonstrate inconsistency in Plaintiff's cognitive capacity. The WAIS testing was performed over three sessions because of Plaintiff's limitations. ECF No. 9, Ex. 12F at 11. During her first session, on December 10, 2003, "her behavior was remarkable for poor self-monitoring, rapid rate of speech, and irrelevant, tangential and circumstantial content of speech." *Id.* On the second testing date, January 6, 2004, her speech issues were largely resolved, but she complained of fatigue after only 2 hours of testing and was rescheduled to complete the evaluation on January 13, 2004. *Id.* This is entirely consistent with the oeuvre of her medical records, which is a significant decompensation of cognitive and linguistic functioning after fatigue. *See infra*, § II(a) (Dr. Endyke's evaluation).

Likewise, the Contextual Memory Testing performed in 2010 demonstrated normal immediate and delayed recall of items. However, that test is intended to assess "awareness

of memory capacity strategy use;" essentially, to determine whether Plaintiff was appropriately using the cueing techniques that she had been practicing to assist her with her memory problems. Much of the therapy performed at Landstuhl included aiding Plaintiff in identifying "moments of becoming tangential." *See e.g.* ECF No. 8-8, Ex. 5F at 51. She complained of being "easily distracted," of her "brain go[ing] elsewhere if not kept busy . . . and not realiz[ing] when new important tasks present themselves," and needing visual or verbal cues to trigger the performance of activities of daily living, like laundry. ECF No. 8.8, Ex. No. 5F, at 15. While the CMT score in 2010 indicates an increased capacity to utilize meta-level tools to identify verbal decompensation, it also indicates that the underlying cognitive issues she was learning to self-identify had persisted from 2004 up to that date.

In sum, even the testing cited by the ALJ indicates that Plaintiff's cognitive and mnemonic capacities were subject to dramatic departures due to mental fatigue, and that her performance "while being treated and while limiting environmental stressors" did not necessarily demonstrate that Plaintiff "can function effectively in a workplace." *Garrison*, 759 F.3d at 1017. Thus, isolated instances of testing showing mnemonic success are not "inconsistent" with the record as a whole.

Plaintiff's doctors consistently demonstrated skepticism about her ability to return to work. Dr. Tindall's opinion itself included a recommendation that Plaintiff not return to her part-time job at McDonalds until she could increase her stamina. ECF No. 9, Ex. 12F. On July 30, 2004, after Dr. Tindall's testing, Plaintiff's treating doctor, Nathan Stime M.D., indicated that Plaintiff was "unable to work at McDonalds due to the motor vehicle accident." ECF No. 9, Ex. 15F at 3. Dr. Stime's letter specifies that the accident "has altered her reasoning" and led to anxiety. *Id.* The Landstuhl therapy, although performed by occupational therapists, indicated goals exclusively related to Plaintiff's non-vocational and scholastic pursuits. Her more recent doctors expressly found that she is unable to work. *See infra*, § 2(a),(c).

Thus, under the interpretive guidance from the Ninth Circuit in *Garrison*, the St. Luke's testing in early 2004 and the Landstuhl testing in 2010 neither reflect Plaintiff's

baseline during the benefits period nor her actual capacity outside of the clinical setting. Accordingly, it does not constitute substantial evidence sufficient to discredit Plaintiff's symptom testimony.

### iii. *Discrediting Plaintiff's Testimony Due to Daily Activities.*

The third reason the ALJ gave to discredit Plaintiff's testimony was inconsistencies between her stated impairments and her daily activities. The Ninth Circuit has "warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016. Recognizing that claimants should not be penalized for attempting to lead their normal lives, "only if Plaintiff's level of activity is inconsistent with h[er] claimed limitations would these activities have any bearing on h[er] credibility." *Id.*

The record does not provide any inconsistencies between Plaintiff's stated impairments and her daily activities of assisting her partner in caring for their young child during the benefits period. Plaintiff testified that her partner did the majority of the household chores, that she had to take frequent breaks during the day, and that she struggled to remember things as basic as changing her child's diaper without relying upon cuing techniques. *See* ECF No. 8.2, at 58. Her testimony about her daily activities is entirely consistent with her alleged limitations, and reflects someone earnestly attempting to overcome her limitations and lead her normal life.

Accordingly, the supposed inconsistencies between Plaintiff's daily activities and her testimony do not satisfy the requirement of a clear, convincing, and specific reason to discredit her testimony. Because neither of the ALJ's other proffered rationales satisfy that requirement, the ALJ erred in discrediting Plaintiff's symptom testimony.

## II. Whether the ALJ Improperly Rejected Medical Opinion Evidence?

Plaintiff contends the ALJ improperly rejected the medical opinion evidence of Dr. Peter Endyke and Dr. Lylanya Cox. The Ninth Circuit distinguishes between three

categories of medical providers when assigning the weight to be given to their opinions: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant but who review the claimant's file (non-examining or reviewing physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan* 246 F.3d at 1202.

A treating provider's opinion is controlling, unless contradicted by substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). Even if there is substantial contrary evidence in the record, it is still "'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007), quoting Social Security Ruling 96–2p at 4, *available at* 61 Fed.Reg. 34, 490, 34,491 (July 2, 1996).

It is undisputed that Dr. Cox and Dr. Endyke were treating physicians. The issue before the Court is whether the ALJ erred in giving their opinions little weight. For the reasons explained below, the ALJ did so err.

### a. Dr. Peter Endyke, Psy.D.'s Opinion

Treating physician Dr. Peter Endyke began treating Plaintiff on May 17, 2011. ECF No. 9, Ex. 19F at 1390. Dr. Endyke's initial evaluation indicated cognitive impairments, based on the Minnesota Multiphasic Personality Inventory (MMPI). His impression of Plaintiff includes the following assessment:

> "[t]here is a longstanding, underlying moderate to severe level of depression and anxiety she can no longer hide or 'pretend' does not exist. She feels hopeless and helpless about her situation. She feels guilty about her disabilities, and wishes not to be a burden, but she desperately needs financial and emotional support. She struggles to sleep, she has fatigue and often has little or no motivation. She is a severely injured person who does not want to ask for anyone's help, but for now she will, for the sake of her children."

ECF No. 9, Ex. 19F, at 1393.

//

Dr. Endyke provided an initial diagnosis of a GAF of 45 (indicating serious symptoms or serious impairments in social, occupational, or school functioning.). He recommended that Plaintiff "apply for disability, as it seems evident she would qualify." ECF No. 9, at 1394.

In January of 2012, Dr. Endyke performed a mental capacity assessment. ECF No. 8-9, Ex. 6F. He found marked and extreme limitations in Plaintiff's mental capacity across understanding and memory, sustain concentration and persistence, and adaptation. *Id.* Most relevantly, he found extreme limitations in Plaintiff's ability to complete a normal workday, complete a normal workweek, and perform at a consistent pace with standard rest periods. *Id.* He attributed these limitations to the severe head injury suffered in 2003. He performed a residual functional capacity questionnaire, indicating significant limitations in Plaintiff's ability to work without taking frequent, prolonged breaks. *Id.*

At the end of August, 2012, Dr. Endyke performed another mental capacity assessment. ECF No. 9, Ex. 20F, 1397. This time, he found moderate and marked limitations in mental capacity across understanding and memory, sustained concentration and persistence, and adaptation. *Id.* Likewise, he found marked, rather than extreme, limitations in Plaintiff's ability to complete a normal workday, complete a normal workweek, and perform at a consistent pace with standard rest periods. *Id.* He continued to attribute these limitations to the 2003 motor vehicle accident. *Id.*

**b.    The ALJ's Rationales for Discounting Dr. Endyke's Opinion**

The ALJ discounted Dr. Endyke's opinions for three reasons: first, because Dr. Endyke's treatment and diagnosis of Plaintiff's reduced mental capacity occurred after the benefits period; second, because the ALJ determined that Dr. Endyke's opinions regarding Plaintiff's cognitive limitations were inconsistent with other medical records; and third, because Dr. Endyke purportedly lacked the expertise to opine on Plaintiff's physical and social functioning limitations.

//

//

*i. The Gap from the Date Last Insured to Dr. Endyke's Treatment*

The first reason given to discredit Dr. Endyke's testimony, the fact that Dr. Endyke's treatment and diagnosis occurred after the date last insured, fails as a matter of law. The Ninth Circuit has repeatedly held that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition." *Lester*, 81 F.3d at 832 (quoting *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)).

*ii. Inconsistent Evidence from an Accepted Medical Source*

The second reason, perceived inconsistencies between Dr. Endyke's opinion and other medical evidence in the record, can serve as a basis for affording a treating doctor's opinions little weight. *See, e.g., Lester*, 81 F.3d at 833. The ALJ does not make clear what "other medical evidence" is used to discredit Dr. Endyke's opinion, saying only that "the evidence summarized above indicates the claimant had no more than mild deficits in cognitive functioning soon after the 2003 motor vehicle accident and approximately a year after the date last insured." AR 38. The medical evidence that this most likely refers to are the treatment notes from St. Luke's Rehabilitation Institute, ECF No. 9, at 1030-36, and Landstuhl Army Medical Center, ECF No. 8-8, 5F at 15.

When determining what medical evidence in the record can be used to justify a diminution in weight for a treating physician's opinion testimony, courts treat differently medical opinions stemming from "acceptable medical sources" and those made by other sources. *See* Social Security Ruling, SSR 06-03p.; *Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies,* 71 FR 45593-03. The St. Luke's medical records do come from an acceptable medical source, Dr. Angelique G. Tindall, Ph.D., Clinical Psychologist. *See* 20 C.F.R. § 404.1502(a)(2). However, the Landstuhl treatment notes do not, as that testing was performed by Hattie P. Walker, an occupational therapist. *Id.*

The relevant regulations require an ALJ to articulate the weight given to opinions from medical sources who are not acceptable medical sources. 20 C.F.R. § 404.1527(f)(2).

Specifically, "when an adjudicate determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons." *Id.* Here, the ALJ did not do so, and only summarizes the Landstuhl treatment notes briefly, accepting their findings as true, without addressing the source. *See* AR 35-36. The ALJ failed to provide an adequate articulation regarding the Landstuhl notes. *See* 20 C.F.R. § 404.1527(f)(1),(2).

Dr. Tindall's test, indicating normal, if not above-average, cognitive and mnemonic capacity in early 2004, does not constitute "substantial" evidence sufficient to support the ALJ's decision to give Dr. Endyke's opinion low weight. First, Dr. Tindall was an examining, and not a treating, physician, and thus her opinion is given lower weight than Dr. Ednyke's. *Lester*, 81 F.3d at 830. In *Winans v. Bowen*, the Ninth Circuit held that an ALJ must set forth "specific, legitimate reasons" that are "based on substantial evidence in the record" for resolving a perceived conflict in favor of an examining physician over a treating physician. 853 F.2d 643, 647 (9th Cir. 1987). The existence of the conflict itself cannot serve as the "specific legitimate" reasons to resolve that perceived conflict in Dr. Tindall's favor.

Instead, the applicable regulations detail what factors are to be used when evaluating competing medical opinions from treating physicians. Adjudicates are to look at, *inter alia*, (a) the duration of the treatment relationship and whether the treating source has obtained a "longitudinal picture" of the patient; (b) the nature and extent of the treatment relationship; (c) whether the opinion is supported by medical signs and laboratory findings; (d) whether the opinion is consistent with the record as a whole; (e) and whether the opinion is within the treating source's specialization. 20 C.F.R. § 404.1527(c).

Both opinions were supported by objective testing (the WAIS and MMPI), and both providers were clinical psychologists acting within the scope of their specializations, but the expansive nature and prolonged extent of Dr. Endyke's treatment relationship with Plaintiff should have granted it more weight than Dr. Tindall's examining relationship. Dr. Endyke's January 4, 2012 Medical Source Statement occurred after treating Plaintiff for eight months.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ᴼ 17

His August 31, 2012 Statement occurred after 16 months of treatment. Dr. Tindall's three sessions of testing formed the entirety of her examining relationship with Plaintiff. She would have only seen Plaintiff once, were it not for Plaintiff's inability to perform the testing in one session due to her cognitive limitations. Dr. Endyke was able to gain a "longitudinal picture of [her] medical impairment(s)," while Dr. Tindall was not. *See* 20 C.F.R. § 404.1527(c)(2).

Further, Dr. Endyke's findings were more consistent with the record when taken as a whole than Dr. Tindall's. *See supra*, § 1(b)(ii). In particular this is true when one properly considers both Dr. Endyke and Dr. Cox's opinions as part of the record. *See e.g. Lingenfelter v. Astrue*, 504 F.3d 1028, 1037 (9th Cir. 2007)(finding error to discredit opinion testimony of two treating physicians due to contrary "consensus" of medical opinion, when such "consensus" was created, circularly, by discrediting opinion testimony of treating physicians.)

Thus, it was error for The ALJ to rely upon Dr. Tindall's examining opinion to discredit Dr. Endyke's treating opinion, because none of the enumerated regulatory factors cut in favor of Dr. Tindall's opinion, and because Dr. Endyke's treating relationship presumptively gives his opinion more weight.

### iii. Dr. Endyke's Lack of a Specialization

The third reason the ALJ gave for giving Dr. Endyke's opinion low weight, his lack of specialization in some of the areas he opined on, directly conflicts with Ninth Circuit precedent. *See Lester*, 81 F.3d at 833 (citing *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)). As the Ninth Circuit held in *Lester*, an opinion from a treating physician presumptively has controlling weight because of the "unique perspective" that a treating physician brings to the medical evidence as a whole. *Lester*, 81 F.3d at 833. The Ninth Circuit's rationale is directly on point and applicable here.

"An integral part of the treating physician's role is to take into account all the available information regarding all of his patient's impairments—including the findings and opinions of other experts. The treating physician's continuing

relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment. This is particularly true in cases like Lester's, where the parts of the functional restrictions arising from the claimant's physical impairments cannot be separated from the parts arising from his mental impairments."

*Id.* Thus, while Dr. Endyke's opinion is not given *more* weight in those areas where he is not a specialist, under *Lester* and *Sprague*, the absence of specialization cannot be used as a legitimate reason to discount it. What is more, as a clinical psychologist, he *is* a specialist with regard to the cognitive complaints that form the heart of this dispute.

The ALJ thus erred in not giving Dr. Endyke's opinion substantial, if not controlling, weight.

### c.    Dr. Lylanya Cox

In February of 2013, Dr. Lylanya Cox, M.D., performed a Residual Functional Capacity Questionnaire and a Mental Capacity Assessment. ECF No. 9, Ex. 28F, AR 1603-08. Dr. Cox indicated that Plaintiff would be limited to sedentary work, would miss work frequently, and suffers from moderate to extreme cognitive, social, and adaptive limitations. *Id.*

The ALJ assigned little weight to Dr. Cox's opinion for six reasons, which will be briefly addressed separately. AR 38. First, The ALJ notes that the treatment occurred two-and-a-half years after the date last insured. *Id.* Second, The ALJ suggests that there is a paucity of corroborating objective findings regarding Plaintiff's chronic pain symptoms. *Id.* Third, regarding Plaintiff's mental health impairments, The ALJ noted both a failure to seek counseling until after the date last insured and the absence of counseling notes in the record. *Id.* Fourth, it appears The ALJ disputes Dr. Cox's qualifications to diagnose mental functioning. *Id.* Fifth, The ALJ notes inconsistencies between other medical evidence in the record and Dr. Cox's findings of decreased mental functioning, and due to the absence of objective testing and symptomology corroborating Dr. Cox's findings.

The first reason for assigning little weight to Dr. Cox's opinion, that the treatment occurred years after the DLI, is not legitimate. *See Supra,* § (II)(b); *Smith*, 849 F.2d at 1225.

Nor is the second reason, an alleged absence of corroborating findings regarding chronic pain, supported by substantial evidence in the record. Almost all of the medical records indicate that Plaintiff suffers from chronic pain, and records need not provide the same exact diagnosis and medical recommendation to corroborate a medical opinion. In fact, the same records used by the ALJ to give Dr. Endyke and Dr. Cox's opinions low weight, Dr. Tindall's evaluation in 2004, include a description of "constant back and head pain." ECF No. 9, Ex. 12F at 9. She was prescribed prednisone for her chronic headaches at that time. ECF No. 9, Ex. 12F at 32. Despite the ALJ's concerns about the absence of "radiological evidence" or "objective findings on examination" regarding her chronic pain, the records show she was consistently treated for it from 2003 until the present.

The third reason, Plaintiff's failure to seek counseling for mental health problems, is also not supported by the record. Plaintiff had an active diagnosis of depression with anxiety in all of her relevant treatment notes. She was prescribed Ativan and Lexapro to address these conditions. *See, e.g.*, ECF No. 9, Ex. 14F. Her treatment history for those conditions corroborates their existence.

The fourth reason given by The ALJ is somewhat difficult to parse. "Dr. Cox was her medical treatment provider, not her medical treatment provider, and it is not clear from the record that Dr. Cox is specifically trained to give an opinion as to the claimant's mental functioning." ECF No. 9-2, at 21. The Court construes this as a challenge to Dr. Cox's expertise, akin to the third rationale provided for discounting Dr. Endyke's opinions. *See supra*, § 2(b)(iii). For the same reasons as outlined above, this rationale is inappropriate. *Id.*

The fifth reason to not give Dr. Cox's opinion controlling weight is akin to the second reason given to discount Dr. Endyke's opinion. *See supra*, § 2(b)(ii). As a treating physician, Dr. Cox's opinion presumptively outweighs that of Dr. Tindall's, and for the same reasons as outlined above, the ALJ erred by cherry-picking one piece of medical evidence, a test performed by an examining physician, and disregarding the corroborating evidence of Dr. Endyke's treating opinion. Thus, the ALJ erred by giving Dr. Cox's opinion low weight.

//

## CONCLUSION

The ALJ erroneously rejected medical opinion evidence and Plaintiff's symptom testimony. The record has been fully developed and further administrative proceedings will not be useful: the ALJ has failed to provide legally sufficient reasons for rejecting both the claimant testimony and medical opinions of Dr. Cox and Dr. Endyke; and if that improperly rejected evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *See Garrison*, 759 F.3d at 1020. Consequently, the proper remedy is to remand for a calculation and award of appropriate benefits. *Id.* at 1019-20.

Accordingly, **IT IS ORDERED**:

1. Plaintiff's Motion for Summary Judgment, ECF No. 14, is **GRANTED**.

2. Defendant's Motion for Summary Judgment, ECF No. 15 is **DENIED**

3. The decision of the Commissioner is reversed and this matter is **REMANDED** for a calculation and award of appropriate benefits.

4. The District Court Executive is directed to enter judgment in favor of Plaintiff and against Defendant.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 27th day of December 2018.



Stanley A. Bastian
United States District Judge